UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CONSERVATION CONGRESS and
KLAMATH FOREST ALLIANCE,

NO. CIV. S-07-2764 LKK/KJM

          Plaintiffs,

     v.

                                        O R D E R

UNITED STATES FOREST SERVICE,

          Defendant.

_____/

    This action arises from defendant U.S. Forest Service's decision to undertake the Pilgrim Vegetation Management Project on the Shasta-Trinity National Forest.   Plaintiffs Conservation Congress and Klamath Forest Alliance have brought suit, alleging that defendant failed to comply with the National Forest Management Act and the National Environmental Policy Act.   Specifically, plaintiffs argue that defendant (1) failed to engage in sufficient monitoring of management indicator species, (2) failed to classify a variance from a tree retention standard as significant, (3) failed to analyze the project's effects on the northern spotted

1

1  owl, and (4) failed to comply with forest plan requirements

2  pertaining to cavity-nesting species.  Pending before the court are

3  the parties' cross-motions for summary judgment.  The County of

4  Siskiyou has also filed an amicus brief in support of defendant,

5  which argues that the project is necessary to curb the risk of

6  wildfires.  The court resolves the argument upon the parties'

7  papers and after oral argument.  For the reasons explained below,

8  plaintiffs' motion for summary judgment is granted in part and

9  denied in part.

10                        **I. Background**

11     Plaintiff Conservation Congress is a non-profit organization

12  dedicated to maintaining, protecting, and restoring the native

13  ecosystems of northern California.  Decl. of Denise Boggs ¶ 3.

14  Plaintiff Klamath Forest Alliance is also a non-profit

15  organization, whose primary mission is to promote sustainable

16  forest practices.  Decl. of Kyle Haines ¶ 3.  Plaintiffs challenge

17  defendant U.S. Forest Service's decision to undertake the Pilgrim

18  Vegetation Management Project ("Pilgrim project") pursuant to the

19  Administrative Procedures Act ("APA").  5 U.S.C. §§ 701-706.

20  **A. Pilgrim Project**

21     The Pilgrim project lies northeast of the community of

22  McCloud, California.  In recent years, the project area has

23  experienced significant tree mortality from insect attacks in

24  overcrowded portions of the forest and from root disease in

25

26

                              2

1  ponderosa pine.[1]  AR 521.  According to defendant, the basic design
2  of the Pilgrim Project contains four components.  Id.  First, the
3  project will thin forest stands that are overcrowded and in which
4  trees face over-competition for water and nutrients.  Id.  Second,
5  the project will remove dead and dying trees from certain stands
6  in order to control the spread of disease and infestation and allow
7  the stands to regenerate.  Id.  Third, in connection with this
8  sanitation harvest, the project will remove smaller, dense
9  understory trees that act as fuel ladders to reduce the likelihood
10 of catastrophic fires.  AR 521-22.  Fourth, the project will also
11 remove overtopping conifers to allow oak and aspen stands currently
12 being lost due to over-competition to reestablish themselves.  AR
13 522.

14      The vegetation management treatments will take place on
15 approximately 3,800 acres.  AR 166.  Specifically, the project
16 will, among other things, undertake the following: commercial
17 thinning and sanitation harvest on 3,100 acres of assertedly
18 overstocked coniferous stands, regeneration treatment in 415 acres
19 of diseased and insect-infested stands and replanting with conifer
20 seedlings, and restoration of 275 acres of dry meadows by removal
21 of encroaching conifer trees.  AR 155.  With respect to the

22 ———————————

23      [1] This was ascertained through field studies.  Administrative
    Record ("AR") 168 ("Each stand within the project area was field
24  examined by a Certified Silviculturist to determine current stand
    attributes including age, site class, mortality level, presence of
25  root disease, and stand density."); AR 170 ("Field review in June
    2005 showed that the stands are continuing to succumb to western
26  pine beetle attacks.").

1  regeneration treatment on the 415 acres,[2] the otherwise applicable

2  standard of retaining 15% of the largest green trees (the "15% GTR"

3  standard) will not be met on 255 acres, because defendant maintains

4  that there are not enough disease-free trees to meet the standard.

5  Id.

6      Defendant issued its Record of Decision and Final

7  Environmental Impact Statement ("EIS") on June 1, 2007.  AR 153.

8  Defendant considered three other alternatives to the one ultimately

9  selected.  The No-Action Alternative would implement no vegetation

10  management actions.  AR 524.  It was rejected because it would

11  allow for disease, insect infestation, and hazardous fire

12  conditions to continue and spread.  Another alternative was similar

13  to the alternative ultimately adopted except that it would retain

14  the 15% GTR standard.  Id.  It was rejected because the 15% GTR

15  standard purportedly could not be met given tree mortality

16  conditions.  Finally, the last alternative would have only thinned

17  overstocked stands on 535 acres to a 60% or greater canopy closure

18  but would otherwise conduct thinning in the same manner as the

19  preferred alternative.  Id.  This alternative was rejected because

20  it would not sufficiently address tree mortality.

21  **B. Statutory and Regulatory Structure**

22      **1. NFMA**

23      The Forest Service manages the national forests pursuant to

24  its duties and obligations under the National Forest Management Act

25  _____

26      [2]  The "regeneration treatment" was also referred to as
"Clearcut w/Reserve Trees."  AR 2901.

1  ("NFMA").  16 U.S.C. § 1600 *et seq.*  One of these duties includes

2  the  duty  to  "provide  for  diversity  of  plant  and  animal

3  communities."  16 U.S.C. § 1604(g)(3)(B).  The Forest Service uses

4  management  indicator  species  ("MIS")  to  gauge  the  effects  of

5  management activities.  An MIS species is a bellwether, or class

6  representative,  "for  other  species  that  have  the  same  special

7  habitat needs of population characteristics."  <u>Inland Empire Pub.</u>

8  <u>Lands Council v. U.S. Forest Serv.</u>, 88 F.3d 754, 762 n.11 (9th Cir.

9  1996).

10      Management occurs at both the forest level and the individual

11  project level.  At the forest level, the Forest Service develops

12  a  Land  and  Resource  Management  Plan  ("LRMP"  or  "forest  plan"),

13  which  is  a  broad,  long-term  planning  document  for  an  entire

14  national  forest.  "These  plans  operate  like  zoning  ordinances,

15  defining  broadly  the  uses  allowed  in  various  forest  regions,

16  setting goals and limits on various uses . . . but do not compel

17  specific actions."  <u>Citizens for Better Forestry v. U.S. Forest</u>

18  <u>Serv.</u>, 88 F.3d 754, 757 (9th Cir. 1996).  At the project level,

19  NFMA mandates that site-specific projects (such as resource plans,

20  permits, contracts, or other instruments for occupancy and use of

21  forest lands) "shall be consistent with the land management plans."

22  16 U.S.C. § 1604(i).  Once a forest plan is approved, the Forest

23  Service implements the plan by approving or denying site-specific

24  actions.  <u>Forest Guardians v. U.S. Forest Serv.</u>, 329 F.3d 1089,

25  1092 (9th Cir. 2003).

26  ////

### a. Applicable Regulations

The parties disagree as to which set of NFMA regulations -- those promulgated in 1982 or 2000 -- apply here.[3]  It is not at all clear, however, why this dispute is material.  It appears that the legally relevant question ostensibly sought to be answered by this dispute is whether monitoring the habitat of MIS species is a permissible substitute for monitoring the population of MIS species (the so-called "proxy-on-proxy" approach).  As detailed in the analysis section below, however, Ninth Circuit case law interpreting the 1982 rule concluded that such habitat monitoring was permissible, at least under certain circumstances.  Similarly, the 2000 rule also permitted habitat monitoring as a surrogate for species monitoring (under the general direction that officials consider the "best available science" in implementing forest plans).[4]  Thus, for purposes here, it is immaterial which set of regulations apply.[5]

---

[3] Both parties agree that another set of regulations, passed in 2005, are no longer in effect because of the injunction issued in Citizens for Better Forestry v. U.S. Dep't of Agric., 481 F. Supp. 2d 1059 (N.D. Cal. 2007).  Both parties also agree that the recently revised regulations, promulgated on April 21, 2008, 73 Fed. Reg. 21,468 (Apr. 21, 2008), do not apply to the project because of a transition provision.

[4] It is not at all clear to the court that habitat monitoring is a better "available science" than species monitoring, or in what sense it is superior.  The plaintiffs, however, while objecting to habitat monitoring as violative of the forest plan, do not rely upon the question of whether it is the best available science. Accordingly, the court does not consider the question further.

[5] At oral argument, the parties essentially conceded that the dispute was immaterial to the outcome of the litigation.

6

1          **b. Shasta-Trinity National Forest Land and Resource**

2          **Management Plan**

3      Regardless of whether the 1982 or 2000 regulations apply, it

4  is clear that site-specific projects must nevertheless be

5  consistent with the governing forest plan. Here, the governing

6  forest plan for the Shasta-Trinity National Forest ("STNF") is the

7  STNF LRMP, which was adopted in June 1995. AR 4063-4411. That

8  plan also incorporates the Northwest Forest Plan, which was adopted

9  in April 1994 to provide a regional strategy for addressing issues

10 related to the northern spotted owl ("NSO"), a threatened species

11 under section 4 of the Endangered Species Act. 16 U.S.C. § 1533.

12     To provide for diversity of wildlife, the STNF LRMP

13 denominated several management indicator assemblages. AR 4109.

14 The assemblages are named by either their habitat or habitat

15 components, such as Late Seral, Openings and Early Seral, Multi-

16 habitat, Hardwood, and Snag and Down Log (the assemblages relevant

17 to the present action). Id. There are a total of nine wildlife

18 assemblages and three fish assemblages, although not all

19 assemblages are used as management indicators for every project.

20 AR 4109. The planners also listed examples of species that would

21 be associated with each assemblage. Thus, for example, the species

22 associated with the Late Seral assemblage include the NSO, goshawk,

23 fisher, marten, Towbridge shrew, and northern flying squirrel. AR

24 4110.

25     The STNF LRMP also established a rather inscrutable

26

7

1 "Monitoring Action Plan"[6] with three levels of monitoring, ranging

2 from the general to the more specific.  AR 4305-06.  First, at the

3 highest level, is "validation" of the MIS monitoring program.  AR

4 4306.  Validation is conducted "to determine if changes are needed

5 in management practices. . . to provide adequate protection to

6 wildlife."  AR 4306.  This validation occurs at the regional and

7 forest-wide level every ten years.  AR 4306.  Second, at the

8 intermediate level, is "effectiveness monitoring," which, according

9 to defendant, ascertains whether certain management activities are

10 having their desired effects, as measured by changes in an

11 indicator species or habitat components.  The plan directs

12 officials to "[u]se appropriate indicator species or habitat

13 components to represent the assemblages."  Id. (emphasis added).

14 Effectiveness monitoring is conducted every one to five years, and

15 is reported every five years.  Third, at the lowest level, is

16 "implementation monitoring," which "ensure[s] that management

17 requirements and standards and guidelines are being met or exceeded

18 with on-the-ground activities."  AR 4305.  This monitoring is on-

19 going but is reported every two years.  Id.

20 **2. NEPA**

21 The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§

22 4321-4370f, is essentially a procedural statute that requries

23

---

24 [6] This document is laid out in table format and is comprised
of mostly sentence fragments.  It displays the following
25 categories:  Activity, Practice, or Effect; Techniques and/or Data
Sources; Intensity and Standard; Frequency of Measuring/Reporting;
26 Expected Precision/Reliability; and Variability in Standard Which
Would Require Further Evaluation and/or Corrective Action.

1   federal agencies to analyze foreseeable environmental impacts of

2   major federal actions and to explore possible alternatives.  42

3   U.S.C. §§ 4321, 4331; 40 C.F.R. § 1501.1.  Its primary purpose is

4   to ensure that federal agencies take a "hard look" at the

5   environmental consequences of proposed actions.  Robertson v.

6   Methow Valley Citizens Council, 490 U.S. 332, 350-51 (1989).  When

7   an agency proposes a major federal action that significantly

8   affects the quality of the human environment, it must prepare an

9   Environmental Impact Statement.  42 U.S.C. § 4332(2)(C).

10   **II. Standard**

11       In challenges to final agency action, the court does not

12   employ the usual summary judgment standard for determining

13   whether a genuine issue of material fact exists.  Home Builders

14   Ass'n of N. Cal. v. United States Fish & Wildlife Serv., 268 F.

15   Supp. 2d 1197, 1206 (E.D. Cal. 2003).  This is because the court

16   is not generally called upon to resolve facts in reviewing

17   agency action.  Id. at 1207; Occidental Eng'g Co. v. INS, 753

18   F.2d 766, 769-70 (9th Cir. 1985).  Instead, the court's function

19   is to determine whether or not, as a matter of law, the evidence

20   in the administrative record permitted the agency to make the

21   decision it did.  Occidental Eng'g, 753 F.2d at 769-70; Home

22   Builders Ass'n, 268 F. Supp. 2d at 1207.

23       The APA authorizes the court to set aside agency action

24   that is "arbitrary, capricious, an abuse of discretion, or

25   otherwise not in accordance with the law."  5 U.S.C. §

26   706(2)(A); Nw. Envt'l Def. Ctr. v. Bonneville Power Admin., 477

9

1 F.3d 668, 682 (9th Cir. 2007).  While "the scope of review under

2 the arbitrary and capricious standard is narrow and a court is

3 not to substitute its judgment for that of the agency," "the

4 agency must examine the relevant data and articulate a

5 satisfactory explanation for its action including a rational

6 connection between the facts found and the choice made."  Id. at

7 687 (internal quotation marks omitted).

8      "That is, an agency must cogently explain why it has

9 exercised its discretion in a given manner and in reviewing that

10 explanation, [the court] must consider whether the decision was

11 based on a consideration of the relevant factors and whether

12 there has been a clear error of judgment."  Id. (internal

13 quotation marks omitted).  The court "may uphold a decision of

14 less than ideal clarity if the agency's path may reasonably be

15 discerned."  Beno v. Shalala, 30 F.3d 1057, 1073 (9th Cir. 1994)

16 (internal quotation marks omitted).[7]

17                             **III. Analysis**

18 **A. MIS Monitoring**

19      **1. STNF LRMP**

20      Plaintiffs' principal claim is that defendant failed to

21 conduct adequate MIS monitoring in deciding whether to undertake

22 the Pilgrim project.  Here, the monitoring requirements imposed

23 _____

24    [7] The danger of ambiguity is that it, in effect, permits the court to substitute its judgment for that of the agency.  That fact

25 suggests that at the least reasonable clarity is required.  Here, where much of the agency's record is far from comprehensible, the

26 court must resist the temptation to decide under the guise of interpretation.

1  by the STNF LRMP are less than pellucid.  The Monitoring Action
2  Plan, under the heading of "effectiveness monitoring," directs
3  officials to "[u]se appropriate indicator species or habitat
4  components to represent the assemblages.  Survey for occupancy,
5  reproductive success, population stability and growth,
6  ecological health."  AR 4306.  On the one hand, the plan is
7  clearly written in the disjunctive, permitting *either* population
8  monitoring *or* habitat monitoring.   To read the plan as
9  plaintiffs urge would render the word "or" a nullity.  On the
10 other hand, terms such as "occupancy" and "reproductive success"
11 clearly refer to animal species biology and thus would only make
12 sense in the context of population monitoring.  AR 3115.  It
13 could be the case that the portion of the plan incorporating
14 these terms is only meant to be relevant if and when population
15 monitoring is undertaken; but if that was the plan's intended
16 purpose, its wording hardly conveys that intent.  In any event,
17 the court need not resolve the issue, because, as explained
18 below, even assuming that the plan permits either habitat
19 monitoring or population monitoring -- the interpretation urged
20 by defendant -- the court is unpersuaded that habitat monitoring
21 is appropriate given the facts of this case.

22    **2. Proxy-On-Proxy Approach**

23       The purpose of monitoring MIS is to estimate the effects of
24 proposed management activities on fish and wildlife populations.
25 Inland Empire, 88 F.3d at 754 n.11.  MIS are selected as proxies
26 for other species that have the same habitat needs or population

11

1   characteristics.  Id.  While some circuits have barred the use

2   of monitoring the habitat of MIS as a proxy for monitoring MIS

3   themselves, see Utah Envtl. Congress v. Dombeck, 372 F.3d 1219

4   (10th Cir. 2004); Sierra Club v. Martin, 168 F.3d 1 (11th Cir.

5   1999), the Ninth Circuit has not.  Instead, the Ninth Circuit

6   has permitted the use of this so-called "proxy-on-proxy"

7   approach so long as certain conditions are satisfied.  "Our case

8   law permits the Forest Service to meet the wildlife species

9   viability requirements by preserving habitat, but only where

10  both the Forest Service's knowledge of what quality and quantity

11  of habitat is necessary to support the species and the Forest

12  Service's method for measuring the existing amount of that

13  habitat are reasonably reliable and accurate."  Native

14  Ecosystems Council v. Dombeck, 428 F.3d 1233, 1250 (9th Cir.

15  2005); Idaho Sporting Cong. v. Thomas, 137 F.3d 1146 (9th Cir.

16  1998) ("the Forest Service's decision to use habitat as a proxy

17  for fish populations was not arbitrary and capricious").

18      Even when interpreting the 1982 regulations (which are

19  arguably more demanding than the 2000 regulations), the Ninth

20  Circuit held that habitat management was permissible.  Inland

21  Empire, 88 F.3d at 761-62 ("We recognize that the [Forest]

22  Service's methodology necessarily assumes that maintaining the

23  acreage of habitat necessary for survival would in fact assure a

24  species' survival.  The Service is entitled to rely on

25  reasonable assumptions in its environmental analyses."); id. at

26  761 n.8 ("We therefore reject Plaintiffs' argument that the

12

1  Service must assess population viability in terms of actual
2  population size, population trends, or the population dynamics
3  of other species.").

4      Nevertheless, habitat monitoring is only permissible where
5  two conditions are satisfied: first, there must be an accurate
6  and reliable correlation between habitat health and species
7  health, and second, the methodology for measuring habitat must
8  also itself be accurate and reliable.  See Native Ecosystems
9  Council, 428 F.3d at 1250; Gifford Pinchot Task Force v. U.S.
10 Fish and Wildlife Serv., 378 F.3d 1059, 1066 (9th Cir. 2004)
11 ("The test for whether the habitat proxy is permissible . . . is
12 whether it 'reasonably ensures' that the proxy results mirror
13 reality."); Lands Council v. Powell, 395 F.3d 1019, 1036 n.23
14 (9th Cir. 2005) ("The 'proxy on proxy' approach to studying MIS
15 population trends operates on the assumption that as long as a
16 species' habitat is maintained, the species will likewise be
17 maintained."); Inland Empire, 88 F.3d at 762-63 ("Because the
18 number of remaining nesting and feeding territories has a direct
19 impact on the population of the species, the EIS effectively
20 predicts a slight downward population trend in pileated
21 woodpeckers as a result of the timber sales.") (emphasis added).

22     With respect to the demonstrating of an accurate and
23 reliable relationship between habitat health and species health,
24 Gifford Pinchot is instructive.  378 F.3d at 1066-67.  There,
25 the Ninth Circuit permitted the use of proxy-on-proxy analysis -
26 - first approved in the NFMA context in Inland Empire -- in the

13

context of the Endangered Species Act.  It characterized <u>Inland</u> <u>Empire</u> as embodying "the principle of allowing an agency to use proxy modeling to evaluate species population so long as that proxy has a high correlation with the relevant species' population."  <u>Id.</u>, 378 F.3d at 1066 n.4.  "If the modeling approach was reasonable in ensuring an accurate population estimate of a species for NFMA purposes, it follows that a similar modeling approach to estimate species population for ESA purposes is permissible." <u>Id.</u>  The issue in <u>Gifford Pinchot</u> was whether the Fish and Wildlife Service ("FWS") properly analyzed the jeopardy to the NSO posed by a proposed timber harvest. Under the facts of the case, the Ninth Circuit found that the "detailed model for owl population [was] sufficient to ensure that the FWS's habitat proxy reasonably correlates to the actual population of owls."  <u>Id.</u> at 1066 (noting also that "the habitat proxy [did] not exist in a vacuum" because FWS had conducted demographic studies to verify habitat results).

Similarly, with respect to measuring habitat itself, the agency must also employ an accurate and reliable methodology. The habitat analysis in <u>Gifford Pinchot</u>, for example, was "not just a simple 'x number of acres = y number of owls' type of equation."  <u>Id.</u>  Instead, the agency had taken into account the type of land, the extent of existing degradation of the habitat, the owls' distribution, the owls' range, and non-habitat factors, including competition from other species, insects, and disease.  <u>Id.</u>  Conversely, where the agency's methodology for

1  measuring habitat relies on unverified assumptions, proxy-on-

2  proxy analysis is inappropriate.  In <u>Earth Island Institute</u>, the

3  Forest Service listed the project areas that were "assumed to

4  provide high and moderate capability habitat."  <u>Earth Island</u>

5  <u>Institute v. U.S. Forest Serv.</u>, 442 F.3d 1147, 1175 (9th Cir.

6  2006).  The Ninth Circuit rejected this analysis, because there

7  was no identification of the methodology used in determining

8  what constituted suitable habitat.  <u>Id.</u>, 442 F.3d at 1175-76.

9  **3. Pilgrim Project**

10  Here, defendant selected five habitat assemblages based

11  upon the types of habitat present in the project area.  These

12  assemblages included Late Seral, Openings and Early Seral,

13  Multi-habitat, Hardwood Assemblage, and Snag and Down Log.  AR

14  235.  It then analyzed each alternative examined in the EIS in

15  terms of its potential impact on each selected habitat

16  assemblage.[8]  AR 483-86.  Finally, defendant supplemented its

17  habitat monitoring by selecting certain individual species and

18  analyzing the potential effects of each project alternative in

19  relation to population trends for the selected species.  AR 486-

20  _____

21  [8] This portion of the analysis, as reported in the Project
Level Management Indicator Assemblage Report ("assemblage report"),

22  appears reasonably detailed.  That report first summarized the
thirteen different treatment types prescribed by the project (e.g.,

23  thinning, regeneration harvest, hardwood management).  AR 480.  It
then analyzed the effects of each of the thirteen treatment types

24  by each of the three alternatives (excluding the No-Action
Alternative).  AR 482-84.  For example, the assemblage report

25  indicated that the regeneration harvest used by the three
alternatives would convert all 415 acres of Late Seral assemblage

26  existing before the project into 415 acres of Openings and Early
Seral assemblage post-project.  AR 483.

1  513.

2      Plaintiffs argue that defendant has failed to document a

3  sufficient relationship between habitat health and species

4  health.  Here, the mule deer was selected to represent the Open

5  and Early Seral and Multi-Habitat assemblages, the white-

6  breasted nutnatch was selected to represent the Hardwood

7  assemblage, and the red-breasted nuthatch was selected to

8  represent the Late Seral and Snag and Down Log assemblage.

9  "These species were selected because they are found within the

10  project area, the populations are known to be sensitive to

11  habitat quality and there is high confidence population trend

12  data for each."  AR 235.

13      **a. Mule Deer**

14      Defendant analyzed the habitat for mule deer based on

15  various factors, including quality of forage (with a preference

16  for deer brush, willow, and bitterbrush), cover and water, and

17  cover-to-forage ratio (with an ideal ratio of 50:50).  AR 236.

18  In terms of the Open and Early Seral assemblage, the project

19  would convert 535 acres of deer cover habitat into deer forage

20  habitat for fifteen to twenty years while the planted conifer

21  trees of regeneration harvest grow into pole size stands or mid-

22  seral habitat.  AR 237.  The forage-to-cover ratio would be 2:1

23  immediately post-harvest, which is within the range of moderate

24  habitat quality.  Id.  While the project would increase the

25  openings and seral stage habitat on the forest (representing a

26  net .07% gain in forage habitat for the mule deer), and might

1   indirectly stem the risk of fires (through thinning) that would

2   create more of such habitat, these net effects were deemed

3   insignificant.  AR 494; AR 495 ("the final analysis is 'no

4   observable effects.'").

5       Range-wide data from the California Department of Fish and

6   Game indicates that mule deer population has been decreasing

7   since the early 1960s.  AR 494.  The State of California

8   believes the decrease to be attributable to reductions in early

9   seral habitat, whereas the Mule Deer Foundation believes it is

10  due to heavy predator pressure.  Id.  "Currently, the available

11  data is not sufficient to conclude the causes of the decline."

12  Id.

13      This admitted uncertainty makes proxy-on-proxy analysis

14  inappropriate.  Such analysis is only appropriate where the

15  habitat "has a high correlation with the relevant species'

16  population."  Gifford Pinchot, 378 F.3d at 1066 n.4.  Here, the

17  EIS itself indicates that a potential confound of predator

18  pressure makes the link between habitat health and species

19  health sufficiently complex that habitat is an inappropriate

20  proxy for species.  Defendant counters that the only thing that

21  it can directly control is the condition of the habitat, rather

22  than the population of species.  But that is not what is being

23  asked of defendant.  The purpose of monitoring is to gauge the

24  effects of proposed management activity on species; that purpose

25  can still be served by monitoring either management indicator

26  species directly, or, where appropriate, their habitat.  Indeed,

defendant appears to argue that the species represent the habitat, rather than reverse. This improperly inverts the relationship such that species become the proxy for habitat.

Where the agency cannot show that impacts on habitat will correlate with impacts on species' population, as here, habitat monitoring is inappropriate. Because it is unclear whether the decline in mule deer population is attributable to a decline in their relevant habitat, it was improper for the agency to rely on monitoring of such habitat.

### b. White-Breasted Nuthatch

Although white-breasted nuthatches can survive in coniferous forests, they have a strong association with hardwoods. AR 495. They tend to nest and live in old woodpecker holes and will excavate their own cavities in soft snags (dead, standing trees) over 14" diameter at breast height. AR 495-96. In the project area, the hardwood habitat is comprised of twenty acres of scattered aspen. AR 496. Due to this limited size, forage opportunity is poor. Id. Soft snags are also uncommon due to rapid felling from termites and carpenter ants, and thus the white-breasted nuthatches tend to nest in woodpecker holes. Id. The project would remove competing conifers and increase the presence of aspen. AR 497.

The assemblage report found that "[a]lthough we [] lost 14,856 acres of hardwood habitat on the Forest due primarily to wildfire . . . hardwoods frequently respond well to fire and hardwoods are likely to replace the burnt stand." AR 498. In

addition, "[c]urrent policy on the Forest is to retain and
enhance growing conditions for hardwoods . . . Given this
retention, we believe hardwood occurrence is likely to be stable
or increasing despite the known losses from wildfire."  Id.

Meanwhile, the population of white-breasted nuthatches in
the local and surrounding strata has been increasing.  AR 499.
Strata are divided at the regional level according to similar
habitats, conditions, and fauna.  AR 475.  "Particularly with
highly mobile animals such as birds, these biogeographic regions
allow [the pooling of] data from individual routes, evening out
the highly variable data at a route level."  Id.  Accordingly,
it appears that, because the habitat and population of the
white-breasted nuthatch are correlated with one another, the
Forest Service could properly rely on the use of the former.

### c. Red-Breasted Nuthatch

The red-breasted nuthatch is a common resident in
coniferous forests.  AR 500.  It depends on snags for nesting
sites, and is attracted to mature mixed conifer, which make it
representative of the Snag and Down Log assemblage and the Late
Seral assemblage.  Id.; AR 508.  The average snag density in the
project area is measured at three per acre, AR 501, and Snag and
Down Log assemblage habitat has been increasing despite loss due
to wildfire and harvest, AR 505.  Similarly, there has been a
net gain in Late Seral habitat.  AR 511.

The population of red-breasted nuthatches showed
statistically insignificant increases in the local strata and

1  statistically insignificant decreases in two nearby strata.  AR

2  505.  It also showed a statistically significant increase in one

3  nearby strata and a statistically significant increase survey

4  wide.  Id.  The report stated that given these mixed results,

5  "it is hard to conclude that there is any significant

6  relationship between forest wide increases in late seral

7  assemblage habitat type and population trends for the red-

8  breasted nuthatch."  Id.  Thus, as with the mule deer analysis,

9  the court concludes that there is an insufficient basis for

10  defendant's reliance on the habitat of the red-breasted

11  nuthatch.

12      **3. Selection of Species**

13      Plaintiffs also argue that defendant should have selected

14  the NSO as one of its management indicator species, because the

15  Pilgrim project is within a Critical Habitat Unit ("CHU") for

16  the NSO.[3]  As an initial matter, however, it is important to

17  note that defendant conducted a separate Biological Assessment

18  ("BA") of the project's impacts on the NSO.  The BA is appended

19  to the EIS, AR 339-92, and the Fish and Wildlife Service

20  concurred in the assessment.[4] AR 393-428.  Impacts to the NSO

21  _____

22      [3] The Fish and Wildlife Service has proposed dropping the area
    encompassing the project from the CHU.  72 Fed. Reg. 32,450, 32,472

23  (map), 32,516 (map) (Jun. 12, 2007) (Proposed Revised Designation
    of Critical Habitat for the Northern Spotted Owl).  Of course,

24  until it actually does so, that proposal is not immediately
    relevant.

25      [4] "[W]e concur with your determination . . . based . . . on
    the following: (1) no northern spotted owls or activity centers are

26  known to occur within 1.3 miles of the proposed action based on

1  were also discussed in the EIS as well.   AR 217-26.

2  Accordingly, it appears that plaintiffs' criticism is primarily

3  one of form rather than substance.

4      Defendant also notes that the project area does not contain

5  NSO habitat that would qualify as suitable under the Forest

6  Service's Habitat Capability Model except to the extent that it

7  may contain stands that constitute transient "dispersal"

8  habitat.  AR 347, 353.  This is because of the project area's

9  generally discontinuous forest canopy, insufficient slope, and

10  lack of open water and suitable prey.  AR 347-50, 355, & 366-67.

11  As of 2004, no owls had been spotted within 1.3 miles of the

12  project area (the typical NSO home range radius) over the

13  previous twenty years.  AR 347-50, 355, 366-67.  In addition,

14  defendant argues that insect infestation and disease makes it

15  likely that the project area will become even less suitable as

16  NSO habitat in the future.  AR 347-49.

17      The fact that the habitat at issue is for dispersal does

18  not undermine its significance: the area was designated a CHU

19  to provide for easterly distribution of the NSO.  AR 2784.

20  But the fact that NSO have not been using it as dispersal

21  habitat, and that the area will become further degraded due to

22  insect infestation and disease, are more valid considerations.

23  _____

24  recent surveys; and (2) foraging activity by potential dispersing
   northern spotted owls is highly unlikely and discountable due to
25  habitat fragmentation poor habitat conditions extensive amount of
   diseased trees lack of water supply and associated low prey
26  density."   AR 395.

The Fish and Wildlife Service found that the proposed project would have an adverse effect on the dispersal habitat but concluded that, due to the factors cited above and "the limited amount of dispersal habitat to be affected in the action area (i.e., 673 acres), the Service does not expect that this adverse affect will impede the ability of the action area to provide for the intended conservation needs of the [NSO]." AR 2789.  In light of all these considerations -- the fact that impacts to the NSO were analyzed in a separate BA, that NSO have not used the project area as dispersal habitat for over twenty years, and that the area will become more degraded due to insect and disease -- the court cannot conclude that that defendant's decision not to select the NSO as one of its MIS species was arbitrary or capricious.[5]

### 4. Breeding Bird Survey Data

Plaintiffs also argue that the population data for red- and white-breasted nuthatches is derived from the Bird and Breeding Survey ("BBS"), which is conducted at a scale

_____

[5] In addition to the NSO, plaintiffs also argue that the black bear should have been used instead of the red-breasted nuthatch. But as defendant explained, black bears would be poor MIS species because they are transient and wide-ranging, using a wide variety of different habitats.
Plaintiffs also maintain that the acorn woodpecker should have been used instead of the white-breasted nuthatch, because the white-breasted nuthatch prefers to forage on deciduous trees whereas the project area contains almost entirely coniferous trees. However, one of the purposes of the project is to release previously suppressed hardwood habitat, AR 522, and the white-breasted nuthatch is listed in the LRMP as representative of that assemblage.

1   inappropriate for assessing project-specific impacts.[6]   The

2   BBS, prepared by the U.S. Geological Survey, contains a

3   "disclaimer" on use that states: "The survey covers such a

4   large area that regional differences in number and quality of

5   survey routes are inevitable."   The disclaimer, however, also

6   goes on to report that the BBS is extensively used for both

7   agency decision-making and academic research, and that more

8   than 270 scientific publications have relied on its data.

9        Earth Island Institute expressed reservations about the

10  use of BBS data.   442 F.3d at 1174.   In particular, it found

11  that reliance on BBS data for the Williamson's sapsucker and

12  black-backed woodpecker were insufficient as they were "listed

13  in the 'red' category, meaning the results are 'very

14  imprecise,'" and the hairy woodpecker was "listed in the

15  'blue' category, which reflects data of 'moderate precision.'"

16  These reservations thus appear to be reasonably fact-specific.

17  Cf. AR 3446 (both red-breasted and white-breasted nuthatch

18  rated at the highest credibility level); AR 499 (examining

19  three strata -- Pitt Klamath Plateau, California, and

20  California Foothills -- with highest level of credibility

21  given by BBS).   Accordingly, the court finds that the use of

22  BBS data in this case was permissible.

23  ////

24

25        [6] Although this issue of BBS data reliability is effectively
    moot for the red-breasted nuthatch (given the court's earlier
    finding that habitat analysis for this species is inappropriate),

26  it is not moot for the white-breasted nuthatch.

**B. Fifteen Percent Green Tree Retention Standard**

Under the NFMA, an amendment to a forest plan that results in a "significant" change must be adopted through the same procedures required of the initial forest plan itself (e.g., preparation of an EIS). 16 U.S.C. § 1604(d) & (f)(4). Here, the STNF LRMP provides that fifteen percent of the area associated with each cutting unit (stand) shall be retained (i.e., the 15% GTR -- green tree retention -- standard). AR 4047. On a portion of the project area (approximately 255 acres of the project's 3,800 acres), however, this standard will be violated. The issue here is not whether this variance was substantively justified but whether defendant's procedural treatment of the variance as a non-significant plan amendment was an abuse of discretion. Wilderness Soc'y v. Bosworth, 118 F. Supp. 2d 1082, 1110 (D. Mont. 2000) ("[T]he determination of whether or not an amendment is significant is a discretionary decision.").

As an initial matter, defendant argues that plaintiffs failed to raise this issue at the administrative level and therefore waived the argument. Two other organizations, however, did raise this issue. AR 52. There is no need for a litigant to have personally raised the issue, so long as the issue was raised by another party and the agency had the opportunity to consider the objection. Kern v. BLM, 38 F. Supp. 2d 1174, 1180 (D. Or. 1999), rev'd on other grounds, 284 F.3d 1062 (9th Cir. 2002); City of Sausalito v. O'Neill, 211

1  F. Supp. 2d 1175, 1198 n.3 (N.D. Cal. 2002), aff'd in part and

2  rev'd in part on other grounds, 386 F.3d 1186 (9th Cir. 2004).

3  Defendant responds that these cases did not involve

4  statutorily mandated administrative exhaustion, as implicated

5  here, and that the Supreme Court has held that where

6  exhaustion is mandated by statute, it cannot be waived.  See,

7  e.g., Darby v. Cisneros, 509 U.S. 137, 153-54 (1993).  Of

8  course, the court is not "waiving" any exhaustion requirement;

9  rather, the court concludes that the exhaustion requirement

10  was fully satisfied by virtue of other organizations who

11  voiced the objection.

12      On the merits, the issue of whether a plan amendment is

13  significant is guided by several factors, including the timing

14  and duration of the proposed change, the location and size of

15  the project, and whether the change would alter the long-term

16  relationships between the levels of goods and services

17  provided by the Forest.  Forest Service Handbook at

18  1909.12.5.32 (Aug. 3, 1992); Wilderness Soc'y, 118 F. Supp. 2d

19  at 1110 (citing Forest Service Handbook).

20      With respect to timing, amendment of the GTR standard

21  would be in effect only for the treatment duration of the

22  affected cutting units, and would not be a permanent plan

23  amendment.  AR 287.  Thus, after the project's completion, the

24  15% GTR standard would remain in place for other areas of the

25

26

1  forest.[7]

2      With respect to size, the variance from the GTR standard

3  impacts 255 acres of cutting units.  Id.  Specifically,

4  between less than .0001% and .004% of commercial forest lands

5  and between less than .0001% and .02% of late successional

6  forest in the watershed would be affected.  Id.; cf. Am.

7  Wildlands v. U.S. Forest Serv., No. 97-160, 1999 U.S. Dist.

8  LEXIS 22243, at *17-20 (D. Mont. Apr. 14, 1999) (finding

9  significance where amendment would have affected between 3%

10 and 13% of forests at issue, or 160,000 acres).  Plaintiffs

11 respond, however, that the project area will impact 5% of the

12 available stands for NSO in the relevant watersheds that serve

13 as dispersal habitat and sometimes foraging habitat.  AR 2815.

14 As noted above, however, no NSO has used the project area for

15 dispersal habitat in the last twenty years, and the condition

16 of the dispersal habitat is expected to degrade even further.

17     Finally, defendant argues that the variance is necessary

18 because it will actually work toward meeting the goals of the

19 LRMP by controlling a root disease problem that would result

20 in greater losses to forest cover if no action were taken.  AR

21 287.  One of the alternatives would have retained the 15% GTR

22 standard but was rejected because most of the diseased trees

23 that would have been retained under this alternative would die

24 _____

25     [7] Nonetheless, as far as the area affected is concerned, the
   change is permanent since there will be no green trees in the clear
26 cut area.

within two to ten years.  AR 207-08.  "Leaving up to 15% live,
root diseased pine trees on approximately 255 acres of the
regeneration harvest stands would continue the root disease
cycle within these stands and to adjacent stands as root
disease can spread underground."  Id.

This last argument has particular intuitive appeal -- why
retain trees that will shortly die anyhow?  Plaintiffs'
response is twofold.  First, plaintiffs argue that decadent
trees are also beneficial to certain species, so it is
inappropriate to think of the 15% GTR standard as applying
only to healthy trees.  But defendants note that while the
decadent trees might persist for a time, they would ultimately
fall down altogether and eliminate even their usefulness for
cavity-nesting species.  Second, plaintiffs argue that the 15%
retention rule already took into account the role of insects
and disease.  AR 4196 ("Forest stand densities are managed to
maintain and enhance growth and yield . . . recognizing the
natural role of fire, insects, and disease.").  The cited
section of the forest plan, however, appears to discuss the
15% retention of pockets of late-successional forest across
the watershed, rather than the 15% retention standard that
applies to individual cutting units.  The 15% requirement as
it applies to watersheds is not violated by the project.  AR
213 (post-project, 28% for Ash Creek Watershed and 20% for
Upper McCloud Watershed).

In sum, the size of the project weighs in favor of

1  finding that the variance was a non-significant plan

2  amendment.  Similarly, while the issue of whether the trees at

3  issue on the 255 acres would inevitably die is a more complex

4  issue, it too appears to weigh in favor of defendant.  Based

5  upon the totality of the circumstances, the court finds that

6  defendant permissibly exercised its discretion in construing

7  the variance as a non-significant plan amendment.

8  **C. Impacts to NSO**

9      NEPA requires federal agencies to analyze foreseeable

10 environmental impacts, including cumulative impacts, of major

11 federal actions.  42 U.S.C. § 4332(c)(i).  Cumulative impacts

12 are impacts "on the environment which result[] from the

13 incremental impact of the action when added to other past,

14 present, and reasonably foreseeable future action . . .

15 Cumulative impacts can result from individually minor but

16 collectively significant actions taking place over a period of

17 time."  40 C.F.R. § 1508.7.  Agencies must identify the area

18 in which the effects of the project will be felt, the impacts

19 from the project in that area, and other past, proposed, and

20 future actions.  See City of Carmel-By-The-Sea v. U.S. Dep't

21 of Transp., 95 F.2d 892, 902 (9th Cir. 1996).

22      Here, plaintiffs argue that defendant used an

23 inappropriate scale for its impacts analysis.  In particular,

24 plaintiffs contend that the review of cumulative impacts to

25 NSO was too large and that "[t]he only apparent reason for

26 using such a large analysis area . . . was to try to minimize

1  the stated impacts to the NSO."  Of course, there is no one-
2  size-fits-all approach for impacts analysis: sometimes,
3  agencies should employ larger geographic scales, Idaho
4  Sporting Congress, 305 F.3d at 973, whereas other times,
5  agencies should employ smaller geographic scales, Anderson v.
6  Evans, 314 F.3d 1006, 1021 (9th Cir. 2002).

7      Here, defendant selected an analysis area of 89,000 acres
8  of public and private land for the NSO.  AR 220.  It appears
9  that, contrary to plaintiffs' concern, the analysis area was
10  selected to include impacts, rather than to hide them: "This
11  cumulative effects area was used because there are two other
12  vegetation management projects currently being planned within
13  the CHU and will overlap in time with this project."  AR 220.
14  These two projects, the Mudflow Project and the Algoma
15  Project, were specifically discussed in the EIS.  AR 221-22.
16  In addition, as plaintiffs note, the EIS discussed several
17  other projects, including the Mt. Thin and Fuels Project, the
18  Edson Project, the Davis Vegetation and Road Management
19  Project, the McCloud Flats Phase I Project, the Mud Forest
20  Health Project, and the South Flats Multiproduct Project, the
21  acreage of affected habitat for each project, and the harvest
22  methods used.  AR 220-21.

23      The EIS then analyzed these cumulative effects in
24  conjunction with the preferred alternative, finding that
25  within CHU CA-2 "[t]he combined effects of the proposed action
26  with these effects would/has result in the removal of

1  approximately 2,000 acres of foraging/dispersal habitat . . .

2  and the temporary degrading of approximately 4,200 acres of

3  [such] habitat.  Most of the removed habitat (about 1,800

4  acres) is the result of root disease and [] infestations." AR

5  224.

6       Further, as defendant argues, had it ended its cumulative

7  effects analysis at the local level, it would have been *easier*

8  to conclude that the project had no significant adverse impact

9  on NSO habitat.  This is because, as noted above, the project

10 area is largely unsuitable as NSO habitat due to the land's

11 natural conditions, and no owl has been spotted within the 1.3

12 miles of the project area for over twenty years.[8]  AR 347-50,

13 355, & 366-67.

14      Finally, the EIS found that "[t]he greatest cumulative

15 impact to the [NSO] and its critical habitat in CHU CA-2 is

16 the continued loss of habitat from insect infestations and

17 root disease centers."  AR 222 (noting that, in the last five

18 years, three percent of forage/dispersal habitat in CHU have

19 been lost to insects and disease).  Conversely, where

20 vegetation treatments have been implemented in the last five

21

22     [8] Plaintiffs note that in 2003, one owl was spotted -- not in
the project area or within the 1.3 mile radius but in the adjacent

23 Elk Flat Late-Successional Reserve.  The BA concluded that the owl
likely moved on in search of adequate prey and habitat because the

24 Elk Flat LSR habitat is low capability, and the project area "is
naturally considerably worse."   AR 2810; AR 357 ("Because the

25 operation will not modify the limiting factors making the area
unsuitable . . . it is highly unlikely that owls would occupy the

26 area post-project.")

1  years, they have benefitted owl habitat in the analysis area.

2  AR 414.  While plaintiffs argue that speculative long-term

3  gains do not outweigh short-term losses, <u>Pacific Coast</u>

4  <u>Federation of Fisherman's Ass'ns v. National Marine Fisheries</u>

5  <u>Service</u>, 265 F.3d 1028, 1036 (9th Cir. 2001), it is the short-

6  term losses here that seem the most speculative.  <u>See</u> <u>Envtl.</u>

7  <u>Prot. Info. Ctr. v. United States Forest Serv.</u>, 451 F.3d 1005,

8  1017 (9th Cir. 2006)("[W]e conclude that the [Environmental

9  Assessment] adequately discloses and discusses the short-term

10 increase of fire risk, and USFS's conclusion that the Project

11 will meet the goal of long-term risk reduction is not

12 arbitrary or capricious").

13      In sum, the court finds that the impacts analysis was

14 sufficient and conducted on an appropriate scale.

15 **D. Cavity-Nesting Species**

16      Finally, plaintiffs argue that defendant violated the

17 LRMP's requirements regarding cavity-nesting species.  The

18 plan provides that "snags are to be retained . . . based on .

19 . . an average of 1.5 snags per acre greater than 15 inches in

20 diameter and 20 feet in height."  AR 4048.  In fact, the

21 project aims to do better than that, retaining an average of

22 2-3 snags per acre where feasible.  AR 187; AR 501 ("snag

23 density was set to 2 per acre with the expectation that more

24 pathogenic activity would create an excess of 3 snags per

25 acre.  This exceeds the minimum standards established in the

26 [LRMP].")

1     The EIS indicates that where not even the 1.5 snags per
2 acre requirement can be met, "one 10x10 minimum slash pile or
3 equivalent 5-15 tons maximum large deadwood per acres will be
4 left unburned where tractor piling is described."  AR 346.
5 The EIS explained that in some cases, there simply are not
6 enough snags available, particularly where the stand in
7 question is still relatively young.  AR 446 ("Most of the
8 plantations being treated in this project are from brushfield
9 conversions; few if any snags existed in the reforested areas
10 at the time they were planted.  The trees in the plantations
11 are not large enough to meet the LRMP size requirements for
12 snags.").  Although plaintiffs argue that this violates the
13 LRMP, the requirement is obviously only one that needs to be
14 satisfied where it is at least possible to do.

15     Furthermore, the requirement must be satisfied on
16 "average," and it appears that the project will in fact exceed
17 the 1.5 snags per acre requirement on average.  Indeed, the
18 EIS predicts that the project will ultimately produce snags of
19 better quality, because thinning understory trees leads to
20 more vigorous growth in the remaining trees, which will in
21 turn produce better quality and larger snags.  AR 240.
22 Accordingly, the court rejects plaintiffs' claim that the
23 project violates the forest plan's requirements with respect
24 to cavity-nesting species.

25 ///

26 ///

1                              **IV. Conclusion**

2          For the reasons explained above, both plaintiffs' and

3   defendant's motions for summary judgment are granted in part

4   and denied in part.  The court finds that defendant failed to

5   comply with its monitoring obligations under the relevant

6   forest plan, in violation of the NFMA and APA.  Accordingly,

7   it enjoins the Pilgrim project and remands the matter to the

8   agency for further action consistent with this order.  The

9   clerk's office is directed to enter judgment and close the

10  case.

11         IT IS SO ORDERED.

12         DATED:  May 13, 2008.


14                            _____

15                            LAWRENCE K. KARLTON
                              SENIOR JUDGE
16                            UNITED STATES DISTRICT COURT