1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10  CONSERVATION CONGRESS and
    KLAMATH FOREST ALLIANCE,
11                                          NO. CIV. S-07-2764 LKK/KJM

12          Plaintiffs,

13      v.
                                                    O R D E R
14  UNITED STATES FOREST SERVICE,

15          Defendant.
    _____/
16

17      Plaintiffs Conservation Congress and Klamath Forest Alliance

18  have challenged the United States Forest Service's proposed Pilgrim

19  Vegetation Management Project in the Shasta-Trinity National

20  Forest.  In an order filed May 13, 2008, the court resolved the

21  parties' cross motions for summary judgment.  Conservation Cong.

22  v. U.S. Forest Serv., 555 F. Supp. 2d 1093 (E.D. Cal. 2008).  After

23  granting plaintiffs' motion in part, the court "enjoin[ed] the

24  Pilgrim project and remand[ed] the matter to the agency for further

25  action consistent with [that] order."  Id. at 1110.

26      The Forest Service moves for relief from that order.  The

1

court resolves the matter on the papers and after oral argument.
For the reasons stated below, the Forest Service's motion is
granted and the injunction is dissolved.

## I. Background

The court previously described the Pilgrim proposal as
follows.  Neither party disputes that characterization, and the
scope of the proposal has not changed.

> The Pilgrim project lies northeast of the
> community of McCloud, California.  In recent
> years, the project area has experienced
> significant tree mortality from insect attacks
> in overcrowded portions of the forest and from
> root disease in ponderosa pine. AR[1] 521.
> According to defendant, the basic design of
> the Pilgrim Project contains four components.
> Id.  First, the project will thin forest
> stands that are overcrowded and in which trees
> face over-competition for water and nutrients.
> Id.  Second, the project will remove dead and
> dying trees from certain stands in order to
> control the spread of disease and infestation
> and allow the stands to regenerate.  Id.
> Third, in connection with this sanitation
> harvest, the project will remove smaller,
> dense understory trees that act as fuel
> ladders to reduce the likelihood of
> catastrophic fires.  AR 521-22. Fourth, the
> project will also remove overtopping conifers
> to allow oak and aspen stands currently being
> lost due to over-competition to reestablish
> themselves.  AR 522.
>
> The vegetation management treatments will take
> place on approximately 3,800 acres.  AR 166.
> Specifically, the project will, among other

---

[1] The court previously cited to the administrative record as
"AR."  In the present motion, the Forest Service has submitted a
supplemental administrative record containing documents considered
or produced by the agency after judgment was entered.  The court
refers to the prior record as the "Administrative Record" or "AR"
and to the new record as the "Supplemental Administrative Record"
or "SAR."

> things, undertake the following: commercial
> thinning and sanitation harvest on 3,100 acres
> of assertedly overstocked coniferous stands,
> regeneration treatment in 415 acres of
> diseased and insect-infested stands and
> replanting with conifer seedlings, and
> restoration of 275 acres of dry meadows by
> removal of encroaching conifer trees. AR 155.
> With respect to the regeneration treatment on
> the 415 acres, the otherwise applicable
> standard of retaining 15% of the largest green
> trees (the "15% GTR" standard) will not be met
> on 255 acres, because defendant maintains that
> there are not enough disease-free trees to
> meet the standard. Id.

Conservation Cong., 555 F. Supp. 2d at 1097 (footnotes omitted).

Pursuant to the Forest Service's obligations under the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370f ("NEPA") and the National Forest Management Act, 16 U.S.C. § 1600 et seq. ("NFMA"), the Forest Service prepared an Environmental Impact Statement ("EIS") for the Pilgrim project.[2] The EIS was required "to estimate the effects of [the proposed project] on fish and wildlife populations." Conservation Cong., 555 F. Supp. 2d at 1101. The court interpreted the EIS as having used a "proxy-on-proxy" approach in an attempting to meet this obligation. Rather than estimate effects on all species directly, the Forest Service identified five "assemblages" of multiple species, and selected an individual species that would serve as the proxy for the health of each assemblage. This species was referred to as the "management

---

[2]    Available at http://www.fs.fed.us/nepa/project_content.php?project=4254 (click "Final Environmental Impact Statement [includes appendices and maps]") (last visited Sept. 5, 2010).

1   indicator species" or "MIS."  Then, rather than predict the effects

2   the project would have on indicator species directly, the Forest

3   Service used habitat as a proxy for the indicator species' health.

4          The court held that this analysis was inadequate with respect

5   to mule deer, the species used to represent the "open and early

6   seral" and "multi-habitat" assemblages, and the red-breasted

7   nuthatch, the species used to represent the "late seral" and "snag

8   and down log" assemblages.  Id. at 1103-04.  For these species, the

9   Forest Service had not shown "an accurate and reliable correlation

10  between habitat health and species health," so it was inappropriate

11  to use the former as a proxy for the latter.  Id. at 1101-04.  The

12  court therefore enjoined the project and remanded to the Forest

13  Service.

14         On remand, the Forest Service completed a supplemental

15  environmental impact statement ("SEIS").[3]  The Forest Service now

16  moves for relief from that injunction under Fed. R. Civ. P.

17  60(b)(5).   The Forest Service contends that the SEIS provides

18  additional data and analysis demonstrating that habitat is an

19  appropriate proxy for mule deer and red-breasted nuthatch

20  populations.  The Forest Service also contends that the governing

21  statutes, regulations, and forest plans permit the Forest Service

22  to monitor habitat directly, dispensing with the proxy-on-proxy

23  approach.  Plaintiffs oppose this motion.

24

25      [3]      Available     at     http://www.fs.fed.us/nepa/
    project_content.php?project=4254 (click "Final Supplemental
    Environmental Impact Statement - January 2010") (last visited Sept.
26  5, 2010).

## II. Standard

**A.   Standard for a Fed. R. Civ. P. 60 Motion for Relief from a Judgment**

Fed. R. Civ. P. 60(b)(5) provides that a party may obtain relief from a court order when "the judgment has been satisfied, released, or discharged . . . or applying it prospectively is no longer equitable." <u>See</u> <u>Rufo v. Inmates of the Suffolk County Jail</u>, 502 U.S. 367 (1992). The party seeking the modification bears the burden of proving that a significant change of circumstances warrants the modification of the prior order. <u>Id.</u>; <u>Bellevue Manor Associates v. United States</u>, 165 F.3d 1249, 1255 (9th Cir. 1999). In this situation, the proposed modification must be tailored to the changed circumstance. <u>Bellevue Manor</u>, 165 F.3d at 1255. Alternatively, the modification may be made if the party seeking it shows that "enforcement of the decree without modification would be detrimental to the public interest." <u>Rufo</u>, 502 U.S. at 384.

**B.   Standard for Review of Agency Action under 5 U.S.C. § 706(2)**

In reviewing whether the SEIS has satisfied the prior order and renders prospective application thereof inequitable, the court again applies the standard for review of agency action contained in the Administrative Procedure Act ("APA").

The APA authorizes the court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). An agency decision is arbitrary or capricious where the agency "relied on factors Congress did not intend it to consider, entirely failed to

1   consider an important aspect of the problem, or offered an

2   explanation that runs counter to the evidence before the agency or

3   is so implausible that it could not be ascribed to a difference in

4   view or the product of agency expertise." Lands Council v. McNair,

5   537 F.3d 981, 987 (9th Cir. 2008) (en banc) (quotations omitted).

6   The agency "must articulate a rational connection between the facts

7   found and the conclusions reached." Earth Island Inst. v. U.S.

8   Forest Serv., 442 F.3d 1147, 1157 (9th Cir. 2006) (citing Midwater

9   Trawlers Co-op v. Envtl. Def. Ctr., 282 F.3d 710, 716 (9th Cir.

10  2002)).

11      This standard is especially appropriate when reviewing factual

12  determinations that implicate an agency's scientific expertise.

13  Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, BLM, 273 F.3d

14  1229, 1236 (9th Cir. 2001). Even for scientific questions,

15  however, a court must intervene when the agency's determination is

16  counter to the evidence or otherwise unsupported. See, e.g.,

17  Sierra Club v. U.S. Envtl. Prot. Agency, 346 F.3d 955, 962 (9th

18  Cir. 2003), amended by 352 F.3d 1187 (9th Cir. 2003) (rejecting

19  agency's factual conclusion about cause of air quality exceedance).

20                      **III. Analysis**

21  **A.    Statutory and Regulatory Background**

22      NFMA imposes various substantive obligations on the Forest

23  Service, including the obligation to "provide for diversity of

24  plant and animal communities based on the suitability and

25  capability of the specific land area in order to meet overall

26  multiple-use objectives." 16 U.S.C. § 1604(g)(3)(B).

1    NFMA sets forth two levels of "procedures" to be used in

2  meeting this obligation.  Lands Council, 537 F.3d at 988.  The

3  Forest Service must develop general plans for land management and

4  ensure that individual projects comply with the statute and plans.[4]

5      **1.   Forest Plans**

6    At the more general level, the Forest Service adopts Land and

7  Resource Management Plans.  "These plans operate like zoning

8  ordinances, defining broadly the uses allowed in various forest

9  regions, setting goals and limits on various uses . . . but [the

10  plans] do not directly compel specific actions."  Citizens for

11  Better Forestry v. U.S. Dep't of Agric., 341 F.3d 961, 966 (9th

12  Cir. 2003).  Two such plans cover the Pilgrim project.  One is the

13  Northwest Forest Plan, which pertains solely to the northern

14  spotted owl and spans many national forests.  The court previously

15  held that the Pilgrim project EIS's discussion of the northern

16  spotted owl was adequate, and plaintiffs present no arguments

17  relating to the northern spotted owl in opposition to the present

18  motion.  Accordingly, the Northwest Forest Plan is not at issue

19  here.  The second is the Shasta-Trinity National Forest Land and

20  Resource Management Plan, referred to hereinafter as the "Shasta

21

22

23  ─────────────

24    [4] A third and more general level of procedures is NFMA's
    requirement that the Forest Service promulgate regulations

25  implementing NFMA.  Citizens for Better Forestry v. U.S. Dep't of
    Agric., 632 F. Supp. 2d 968, 970 (N.D. Cal. 2009) (citing Citizens

26  for Better Forestry v. U.S. Dep't of Agric., 341 F.3d 961, 965 (9th
    Cir. 2003)).

1  Forest Plan."[5]

2      The Shasta Forest Plan directs the Forest Service to perform

3  extensive periodic "monitoring," including monitoring of various

4  wildlife characteristics.  The monitoring plan calls for various

5  types of wildlife monitoring, including "validation" monitoring,

6  which is conducted every ten years "to determine if changes are

7  needed in management practices . . . to provide adequate protection

8  to wildlife," Shasta Forest Plan at 5-16, AR 4306; "effectiveness

9  monitoring" which reports every five years on the "management

10  indicator assemblages," id.; and various types of "implementation

11  monitoring" on various timeframes, including monitoring to "ensure

12  that management requirements and standards and guidelines are being

13  met or exceeded with on-the-ground activities," Shasta Forest Plan

14  at 5-15, AR 4305.[6]

15      **2.   Project-Level Studies**

16      NFMA also mandates management of national forests at the

17  "project" level.  Ecology Center v. Castaneda, 562 F.3d 986, 990

18  (9th Cir. 2009).  "Projects" include "permits, contracts,

19  cooperative agreements, and other instruments for occupancy."

20  Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d 754,

21  ────────────────────

22      [5]   Available   at   http://www.fs.usda.gov/Internet/
    FSE_DOCUMENTS/fsm9_008103.pdf,   http://www.fs.usda.gov/

23  Internet/FSE_DOCUMENTS/fsm9_008111.pdf,   and
    http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fsm9_008045.pdf.

24  (last accessed Sept. 6, 2010).

25      [6] The court reiterates its previous characterization of this
    monitoring plan as "rather inscrutable."  Conservation Cong., 555

26  F. Supp. 2d at 1099.

757 (9th Cir. 1996) ("Inland Empire") (quoting 36 C.F.R. § 219.10(e)).  Under this scheme, individual project proposals must comply with NFMA's statutory requirements, NFMA's implementing regulations, and the forest plan or plans encompassing the project site.  16 U.S.C. § 1604(i), Lands Council, 537 F.3d at 989.  The Forest Service uses NEPA's EIS process to determine whether a proposed project will satisfy these requirements.  Inland Empire, 88 F.3d at 757.  In an EIS, the acting federal agency must describe a reasonable range of alternatives for action, the predicted environmental consequences of each, and the reasons underlying the agency's selection of one action over the others.  Under the applicable NFMA regulations, the Forest Service's assessment must be based on the "best available science."  Ecology Ctr., 562 F.3d at 990 (citing 36 C.F.R. § 219.35(a) (2001); 69 Fed. Reg. 58,057 (Sept. 29, 2004)).[7]

_____

[7] The court previously did not decide whether 1982 or 2000 version of the regulations governed.  Conservation Cong., 555 F. Supp. 2d at 1098.  The Ninth Circuit has subsequently explained that the 2000 regulation's "best available science" requirement governs, such that the superceded requirements of the 1982 regulation apply "only to the extent [that] they were incorporated into the [applicable] Forest Plan."  Ecology Ctr., 562 F.3d at 990-91.

Here, plaintiffs argue that the Forest Service is _also_ bound by the 1982 regulation, because the Shasta Forest Plan must have implicitly incorporated it.  Absent such a incorporation, plaintiffs argue, "the court would have to find that the [Shasta Forest Plan] was out of compliance with the governing Forest Plan regulations for 15 years."  Pls.' Opp'n at 8.  Plaintiffs are incorrect.  Projects and management are governed by statute, regulations, _and_ the applicable forest plan.  Lands Council, 537 F.3d at 989.  Thus, the court need not assume that the plan implicitly but completely restated all obligations as they stood at the time the plan was adopted.

1     Much confusion in this case stems from plaintiffs' conflation
2  of monitoring with prediction.  Monitoring looks to conditions as
3  they currently exist.  The Forest Service may determine the present
4  status of wildlife by directly surveying wildlife populations, or
5  by using a heuristic such as proxy-on-proxy monitoring.  The EIS,
6  on the other hand, is necessarily a prediction, albeit one that is
7  informed by past monitoring.  See SEIS L-26, SAR 1102 (explaining
8  that the EIS's analysis of the proposal's effects "must be *informed*
9  *by*" monitoring data) (emphasis added).  Because the project here
10  is essentially a modification of habitat, the EIS must predict the
11  ways  in  which  the  anticipated  changes  to  habitat  will  change
12  wildlife populations and viability.  One way to do so is to use a
13  simple  proxy-on-proxy  methodology,  predicting  that  changes  in
14  species health will mirror the changes in habitat.  Inland Empire,
15  88 F.3d 754, 761-63.  Alternatively, factors other than habitat may
16  be  incorporated  into  the  prediction.  Gifford Pinchot Task Force
17  v. U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1066 (9th Cir. 2004)
18  (prediction  prepared  pursuant  to  the  Endangered  Species  Act  used
19  habitat  as  a  proxy,  but  also  "[took]  into  account  non-habitat
20  factors, including competition from other species, forest insects,
21  and  disease.").  Indeed,  as  with  use  of  proxy-on-proxy  for
22  monitoring,  the  Forest  Service  may  not  predict  the  project's
23  effects solely by referring to future habitat if the relationship
24  between  habitat  and  species  population  is  unexplained.  Native
25  Ecosystems Council v. Tidwell, 599 F.3d 926, 936 (9th Cir. 2010)
26  (rejecting use of proxy-on-proxy to predict project's effects where

1 MIS had previously declined despite preservation of habitat and the

2 Forest Service failed to "adequately discuss" this fact).

3      The court understands plaintiffs to argue that because of

4 uncertainty as to the relationship between habitat trends and

5 population trends, it is impossible to make an informed prediction

6 of the project's effects absent a direct survey of the present

7 populations of the MISs.  See Tidwell, 599 F.3d at 933.  It is

8 nonetheless logically impossible to provide in the EIS, as

9 plaintiffs further demand, "monitoring information . . . of the

10 effects of the sale on the relevant MIS."  Compl. ¶ 31.

11 **B.   The Supplemental EIS's Analysis of the Pilgrim Project**

12      At issue here is whether the SEIS appropriately evaluated the

13 likely impacts of the proposed action and demonstrated that the

14 action will comply with the Forest Service's obligation to "provide

15 for diversity of plant and animal communities."  16 U.S.C. §

16 1604(g)(3)(B).

17      The SEIS adopts a five-step process for "analyzing project

18 effects to management indicator assemblages."  SEIS L-4, SAR 1077.

19 These steps are

20           1.  Identifying which management indicator
          assemblages have habitat that would be either
21        directly or indirectly affected by the project
          alternatives;  these  assemblages  are
22        potentially affected by the project.

23           2.  Disclosing the LRMP forest-level or
          bioregional-level monitoring requirements for
24        this subset of forest management indicator
          assemblages.

25 ////
   ////

26

1           3.   Analyzing   project-level   effects   on
     management indicator assemblage habitats or
2    habitat components for this subset.

3           4. Discussing the forest scale habitat trends
     and/or the bioregional population trends of
4    representative species for this subset.

5           5.   Relating   project-level   impacts   on
     management indicator assemblage habitat to
6    habitat   at   the   forest   scale   and/or   to
     population trends of representative species of
7    the   affected   assemblages   at   the   forest   or
     bioregional scale.

8

9    Id.  Beginning with step one, "management indicator assemblage" is

10   a term defined in the Shasta Forest Plan.  Shasta Forest Plan 3-24,

11   AR 4109.   The assemblages are "groups of wildlife associated with

12   vegetative communities or key habitat components."  Id.  The plan

13   names nine such "wildlife assemblages," which are named after

14   certain habitat characteristics.   Id.   The plan provides a brief

15   summary  of  the  habitat  characteristics  associated  with  each

16   assemblage  together  with  a  non-exhaustive  list  of  vertebrates

17   represented by the assemblage.[8]   Plaintiffs do not challenge the

18   Forest Service's determination as to which assemblages will be

19   affected by the Pilgrim project.  The four at issue in the present

20   motion are the "multi-habitat," "snag and down log," "late seral,"

21

22

23

24           [8]   In adopting the Shasta Forest Plan, the Forest Service
     listed  the  specific  individual  species  associated  with  each
     assemblage,  including  individual  species  suggested  for  use  as
25   indicators for the broader assemblage. Pls.' Opp'n Ex. B (Chapter
     III  of  the  final  EIS  for  the  Shasta  Forest  Plan,  explicitly
26   incorporated into the plan at 3-14, AR 4109).

                                    12

1  and "openings and early seral wildlife assemblage[s]."[9]

2      In the second step, the SEIS discussed Shasta Forest Plan's

3  monitoring plan.   In the present motion, the parties' argument

4  concerning this plan and the SEIS's summary thereof solely pertain

5  to whether the Forest Service could have predicted impacts on

6  wildlife using methods other than the one actually used here.  That

7  question is not properly before the court.

8      The third and fourth steps in the SEIS's analysis describe the

9  proposed project and the effects the project will have on habitat,

10  including the degree to which the project will shift habitat from

11  one assemblage type to another.  For example, areas of the project

12  designated for "regeneration harvest" will be transformed from

13  "late seral" and "snag and down logs" habitat types to "open and

14  early seral" habitat.   SEIS L-17, SAR 1093.   Plaintiffs do not

15  challenge this aspect of the SEIS.  C.f. Idaho Sporting Cong. v.

16  Rittenhouse, 305 F.3d 957, 967 (9th Cir. 2002) (rejecting use of

17  proxy-on-proxy analysis where the Forest Service has inaccurately

18  categorized and tallied habitat).

19      Finally, the fifth step "analyze[s] the habitat components of

20  each management indicator assemblage within the context of an

21  example species."  SEIS L-20, SAR 1096.  These species are the mule

22  deer, red-breasted nuthatch and white-breasted nuthatch.  For each,

23  _____

24      [9] A fifth assemblage, for "hardwoods," will also be affected
    by the Pilgrim project.  The court previously found the Forest
25  Service's analysis of this assemblage, as represented by the white-
    breasted nuthatch, to be adequate.  Conservation Cong., 555 F.
26  Supp. 2d at 1104.  Plaintiffs do not raise any arguments pertaining
    to the hardwood assemblage here.

the SEIS summarized the current condition of the habitat characteristics used by the species, the effects the proposed action and the various alternatives would have on habitat characteristics important to the species, cumulative effects relating to habitat, trends in habitat, and trends in species abundance. Based on this information, the SEIS reached conclusions regarding the project's likely effects on the three example species.

Thus, the Forest Service predicted changes to habitat, predicted the effect that those changes would have on three species identified as representatives of the various assemblages, and used this analysis to inform its prediction of the effects the project would have on the collections of species represented by the assemblages. This method of analysis bears, at the very least, an uncanny resemblance to the proxy-on-proxy method. Nonetheless, the Forest Service argues that it did *not* engage in proxy-on-proxy analysis. It argues that the SEIS's analysis of effects on species did not simply assume that 'x acres of habitat = y numbers of species,' instead incorporating some additional information. The Forest Service argued that it therefore analyzed impacts on habitat components and that it separately analyzed impacts on species. See, e.g., Def.'s Reply at 1. While the Ninth Circuit has labeled an apparently similar analysis as proxy-on-proxy, the label is unimportant. See Gifford Pinchot Task Force, 378 F.3d at 1066. The question is whether the relationship between habitat and species health was such that the Forest Service's use of habitat

14

in this case was proper.  As the court explains below, in light of the additional analysis and information presented in the SEIS, the court concludes that it was.[10]

### 1.  Mule Deer

The prior EIS observed that mule deer populations were generally in decline.  <u>Conservation Cong.</u>, 555 F. Supp. 2d at 1103 (citing AR 494).  It described various authorities that attributed the decline to loss of habitat, but the EIS also acknowledged that others, including organizations discussed by plaintiffs, attributed this decline to an increase in predation.  The initial EIS concluded that "'[c]urrently, the available data is not sufficient to conclude the causes of the decline [in mule deer abundance].'" <u>Id.</u> (quoting AR 494).  Because the Forest Service stated that it was not possible to determine whether the past decline in deer abundance were caused by the decrease in habitat, the prior EIS had not shown that habitat was sufficiently correlated with species health to support the use of proxy-on-proxy analysis in predicting the project's effects on assemblages represented by mule deer.  <u>Id.</u> at 1103-04.

In the SEIS, the Forest Service provides additional discussion of the relationship between mule deer abundance and habitat.  The

---

[10] The Forest Service further argues that, contrary to what was done here, "[i]t would have been wholly appropriate . . . if the Forest Service had ended its analysis with consideration of potential Project effects on [assemblage] habitat, alone." Def.'s Mem. at 11.  Because that counterfactual hypothetical is not before the court, any discussion of said approach would be an advisory opinion.

SEIS explains that "open and early seral" habitat within the Shasta Trinity National Forest is decreasing, largely by growing into "late seral" habitat, and that mule deer populations are also decreasing, both in two geographic monitoring areas overlapping the project area and statewide.  SEIS 16-20, SAR 1039, 1043.  Whereas the previous EIS stated that the cause of the population decline was unknown, the SEIS quotes studies by the California Department of Fish and Game concluding that the long-term statewide decline in deer abundance is "due largely to long-term declines in habitat quality."  SEIS 18, L-28, L-30, SAR 1041, 1104, 1106.  The SEIS explains the relationship between habitat and deer abundance as being dominated by the availability of forage, SEIS 18, SAR 1041, although the SEIS acknowledged the need for cover habitat as well, SEIS L-20, SAR 1096.

The SEIS also specifically rejects the hypothesis that pressure from predators is the primary cause of mule deer decline. The SEIS acknowledges that the Mule Deer Foundation takes a contrary view, and that one study in the Sierra Nevada, which apparently considered deer generally, found that slightly over half (50.5%) of fawns succumbed to predators in their first year.  SEIS 21, SAR 1044.  The SEIS took the view, however, that fawns were made vulnerable to predators because of "resource stress," including poor maternal nutrition and lactation.  SEIS 18, SAR 1041.  Similarly, the California Department of Fish and Game concluded that although multi-state studies indicated that mountain lions were the primary predator, those studies "suggest[ed] that

mountain lion predation did not regulate . . . deer populations." SEIS L-31, SAR 1107 (quotation omitted).  For this reason, the SEIS concludes that predation is in part a symptom of the underlying habitat pressures.  Id.

The Forest Service acknowledges that the issue is complex. Plaintiffs take issue with the Forest Service's statement in its brief that the Forest Service "believes . . . that habitat loss, rather than predation, is the more likely cause of the deer's population decline."  Def.'s brief at 12.  This statement does not demonstrate a concession that the data is too inadequate to support a useful prediction.[11]

Finally, as noted above, the SEIS does not use acres of habitat as an unadorned proxy for predicted deer populations.  The SEIS instead looks to particular habitat characteristics.  The SEIS acknowledges that the present ratio of forage to cover habitat would ordinarily be "excellent" and that the project will shift this ratio to favor forage.  The SEIS further states, however, that a countervailing trend in the project area is the transformation of forage to cover through growth of the forest and that the poor quality of forage habitat in the project area may limit the utility of presently available forage.  SEIS L-21, L-26, SAR 1097, 1102.

---

[11] The court's prior decision rested on the Forest Service's statement that the available data were insufficient to support a conclusion, and the Forest Service has predictably responded by stating that the data are in fact sufficient.  The court is wary of inviting agencies to overstate their confidence, claiming certainty when there is doubt.  As explained in the body of this order, plaintiffs have not demonstrated that this is what occurred here.

The SEIS went on to conclude that "[n]either cover nor forage *quantity* are limiting factors in this area.  Forage *quality* and water availability are limiting factors and are unlikely to change given the project's implementation."  SEIS L-23, SAR 1099 (emphases in original).  Thus, the SEIS concluded that although mule deer were limited by forage and that the project would increase the acreage of forage habitat, this increase was unlikely to significantly benefit mule deer.  SEIS L-32, SAR 1108.  The SEIS concluded that the project would not meaningfully alter trends in mule deer population.  Id.

Plaintiffs have not challenged (or even acknowledged) the Forest Service's findings regarding the interplay of habitat and predation or the importance of water and forage quality rather than mere acreage of forest habitat.  Accordingly, the court cannot find that the Forest Service's findings regarding the project's effects on mule deer were arbitrary or capricious.

### 2.   Red-Breasted Nuthatch

The SEIS, like the EIS, discusses the red-breasted nuthatch to illustrate effects on "snag and down log" and "late seral" assemblages.  In the prior order, the court observed that both of these habitat types had been increasing.  Conservation Cong., 555 F. Supp. 2d at 1104 (citing AR 505, 511).  Red-breasted nuthatches populations, however, revealed conflicting trends.  In the project area, there was a statistically insignificant increase.  In nearby locations, there had been insignificant decreases as well as a significant increase.  Range wide, there was a statistically

18

significant increase in population.   Id.   The EIS itself acknowledged that in light of these results, "'it is hard to conclude that there is any significant relationship between forest wide increases in late seral assemblage habitat type and population trends for the red-breasted nuthatch.'"   Id. (quoting AR 505). Accordingly, the court found proxy-on-proxy analysis to be inappropriate.   Id.

As with mule deer, the Forest Service now retreats from its earlier statement of uncertainty regarding observed trends in habitat and red-breasted nuthatch population.   Unlike with mule deer, however, the Forest Service has itself collected additional data in order to clarify the issue, including two years of direct surveys of red-breasted nuthatch populations within the project area.   SAR 1501-44.   These surveys demonstrated red-breasted nuthatches' ongoing presence in the project area, with no meaningful change in population between the two years.   Id., c.f. Tidwell, 599 F.3d at 933.

The Forest Service has also explained its earlier statement that it was difficult to find a correlation between changes in local habitat and direct *observations* of changes in local population.   In essence, the Forest Service argues that the observations are unreliable, such that the Forest Service concludes that local habitat is correlated with *actual* changes in population. The Forest Service bases this conclusion on the statements that data over broader geographic scales is much more reliable, given the transitory nature of the birds, that this data indicates an

1 increase in population, and that there is not evidence of factors

2 that would cause local population trends to differ from the broader

3 trends.  SEIS 32, 42-43, SAR 1054, 1065-66.

4     Although a pre-requisite to proxy-on-proxy analysis (or

5 similar methods) is a correlation between habitat and population,

6 the agency need not demonstrate this correlation specifically using

7 studies conducted in the project area.  More broadly, NFMA

8 generally does not require "on the ground" analysis to validate

9 modeling predictions. Lands Council, 537 F.3d at 994 (overruling

10 Ecology Ctr. v. Austin, 430 F.3d 1057 (9th Cir. 205) and narrowly

11 construing Lands Council v. Forester of Region One of the U.S.

12 Forest Serv., 395 F.3d 1019, 1036 (9th Cir. 2005).  Of course, even

13 when there is a generally recognized relationship, there can be

14 reason to believe that the general relationship is inapplicable to

15 a specific site, such that reliance on the general relationship is

16 inappropriate.  Tidwell, 599 F.3d at 931-36.  This court's prior

17 order is not inconsistent with the Ninth Circuit's subsequent

18 decisions in Lands Council and Tidwell.  The prior order rested on

19 the Forest Service's own statement that trends in local habitat and

20 observations of population were not "significant[ly] relat[ed],"

21 AR 505, rather than the lack of location-specific data per se.  The

22 Forest Service has since explained that, despite some trends in

23 local observation, it believes that local populations are

24 increasing, such that habitat remains correlated with actual

25 population.

26     Plaintiffs identify no specific fault with the above.  They

20

simply note the difficulties inherent in securing population data for mobile species such as red-breasted nuthatches, re-assert that local observation data do not correlate with local changes in habitat, and suggest that for some other indicator species it might be possible to correlate local observations of population with habitat (or, presumably, demonstrate that habitat and populations were not correlated).  These arguments are unpersuasive.  The Forest Service must use the "best available" science, which will sometimes still be imperfect.  Here, although the red-breasted nuthatch does not lend itself to collection of location-specific population data, plaintiffs have not demonstrated that any superior species was available.  The court previously rejected plaintiffs' argument that either the northern spotted owl or black bear would have been a better indicator species, notwithstanding the fact the Shasta Forest Plan recommends these species but not the red-breasted nuthatch for monitoring.  Conservation Cong., 555 F. Supp. 2d at 1105, 1105 n.11; Pls.' Opp'n, Ex. A, at 12.

Having clarified the analysis of past monitoring data, the SEIS predicts impacts on red-nuthatches, and thus on the "snag and down log" and "late seral" wildlife assemblages in a manner similar to the treatment of mule deer.  The project will affect some habitats of both types through thinning, but in these areas the habitat will continue to provide the habitat characteristics relied on by nuthatches, including "soft snags," in excess of levels mandated by the Shasta Forest Plan.  SEIS 28, 35, SAR 1051, 1058. The project will convert some areas of late seral and snag and down

log habitat to open and early seral habitat, removing from those
areas soft snags and other habitat characteristics used by red-
breasted nuthatches for nesting.  Id.  The SEIS concludes that
these areas will nonetheless provide forage likely to be used by
the species and that this change is not of a magnitude that will
not harm the species.  Id.  In a final parallel to the mule deer
analysis, the SEIS concludes that the particular habitat
characteristic limiting red-breasted nuthatch populations in the
project areas is a characteristic that will not be altered by the
project, the availability of water.  SEIS 29, 35, 45; SAR 1052,
1058, 1068.  For these reasons, the SEIS concludes that the project
"will not alter or contribute to existing forest-wide habitat or
population trends for the red-breasted nuthatch."  SEIS L-50; SAR
1126.  Other than the arguments discussed above, plaintiffs do not
challenge this analysis.

      For these reasons, the court holds that the Forest Service's
findings regarding the project's effects on the red-breasted
nuthatch and associated wildlife assemblages were neither arbitrary
nor capricious.

**C.   Best Available Science**

      Finally, plaintiffs argue that the SEIS did not use the best
available science.  This argument was not presented in plaintiffs'
complaint or litigated in the prior motions, presumably because
plaintiffs contended that the original EIS was not subject to this
requirement, whereas all parties agree that the SEIS is.  The
court's prior order did not decide whether the Forest Service's use

1  of habitat in the EIS constituted best available science, although

2  the court rejected plaintiffs' arguments that certain species would

3  provide better indicators than the species selected by the Forest

4  Service.  Conservation Cong., 555 F. Supp. 2d at 1099 n.4, 1105,

5  1105 n.11.

6      The Forest Service has explained the reasons for its decision

7  to use habitat to monitor and predict effects for forest management

8  on species, and has concluded that method reflects the best

9  available science.  AR 3111, SAR 1013.  The justifications for use

10 of habitat data include the lack of fluctuation over short time

11 scales, credibility, amenability to remote sensing, and importance

12 of habitat in informing the Forest Service's management of habitat

13 itself.  AR 3111.  Plaintiffs have not demonstrated that this

14 method of analysis is "outdated or flawed."  Ecology Ctr. v.

15 Castaneda, 574 F.3d 652, 659 (9th Cir. 2009) (citing Trollers Ass'n

16 v. Gutierrez, 452 F.3d 1104, 1120 (9th Cir. 2006)).  The Forest

17 Service relied on a range of scientific studies, a scientific

18 method previously upheld by the Ninth Circuit, and explained the

19 reasons for choosing this method.  Plaintiffs have not

20 demonstrated, in light of the deference owed to the agency, that

21 any better science is available.  For these reasons, the court

22 concludes that the Forest Service relied on the best available

23 science.  Id.

**IV. Conclusion**

25     For the reasons stated above, the court ORDERS as follows:

26 ////

1.   Defendant's motion for relief from judgment (Dkt. No.
61) is GRANTED.

IT IS SO ORDERED.

DATED:   September 14, 2010.


LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT